AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☒ Original   ☐ Duplicate Original



**LODGED**
CLERK, U.S. DISTRICT COURT
4/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____jb_____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
4/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ram_____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LEVOIL TAKAIS SHANITO FRANKLIN,<br><br>Defendant. | Case No.    5:25mj228-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On February 11, 2025, in the county of San Bernardino in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841(a)(1), (b)(1)(B)(ii) | See attached affidavit |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent, Eric A. Guinee Rose
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  April 18, 2025

_____
*Judge's signature*

City and state:  Riverside, California    Honorable David T. Bristow, U.S. Magistrate Judge
*Printed name and title*

AUSA: Peter Dahlquist (951-276-6267)

**AFFIDAVIT**

I, Eric A. Guinee Rose, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Levoil Takais Shanito Franklin ("FRANKLIN") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) (Distribution of 500 Grams or More of Cocaine).

2. This affidavit is also made in support of an application for a warrant to search a 2015 white Dodge Challenger bearing California license plate ending in 286, Vehicle Identification Number ending in 3021 (the "SUBJECT VEHICLE") as described more fully in Attachment A-1 and the person of FRANKLIN as described more fully in Attachment A-2.

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the Federal Bureau of Investigation (FBI) and have been so employed since 2023. I am currently assigned to the FBI, Los Angeles Field Division, Riverside Resident Agency, and am a member of the Inland Empire Violent Crimes Squad, which is comprised of several law enforcement task forces. These task forces include experienced gang, narcotics and violent crime investigators from the FBI, Riverside County Sheriff's Department ("RSO"), California Department and Corrections ("CDCR"), Riverside County Probation, Fontana Police Department, San Bernardino Police Department, and the San Bernardino County Sheriff's Department ("SBSD").

6. I have received 21 weeks (approximately 840 hours) of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia. Through the course of my employment with the FBI, I have participated in a variety of investigations, including investigations of the following types of crimes: national security, kidnapping, drug trafficking, and violent crimes against children. I have also received 80 hours of

training in the collection and preservation of digital evidence and am an FBI Digital Extraction Technician.

7. Prior to my work with the FBI, for 13 years I worked as a Deputy and Detective with SBSD. During my work there I conducted or participated in hundreds of felony violent crime investigations.

8. As a Special Agent, I have received instructions in the identification, collection, and preservation of evidence, photography, latent print collection, and crime-scene investigations. I have also completed thousands of hours of criminal investigations, including compiling information; interviewing victims, witnesses, and suspects; and collecting evidence to support the filing of criminal complaints and search warrants.

9. Based on my training, experience, and participation in this and other drug trafficking investigations and upon my consultation with other experienced law enforcement officers, I know that individuals involved with drug trafficking and distribution commonly use vehicles to further their distribution operations, such as using vehicles to meet with drug buyers, to transport drugs to and from drug stash locations, to conduct drug and cash exchanges, and to transport drug proceeds from transaction locations to stash locations and/or banks.

### III. SUMMARY OF PROBABLE CAUSE

10. On February 11, 2025, the FBI conducted a controlled meeting where FRANKLIN sold a Confidential Informant ("CI")

approximately one kilogram of suspected cocaine.[1]  The CI arranged the meeting by direct messaging FRANKLIN via his Snapchat account "kali_cuban," and FRANKLIN drove the SUBJECT VEHICLE to the meeting.  On Monday, April 14, 2025, the CI contacted FRANKLIN again through the same "kali_cuban," Snapchat account and arranged the controlled purchase of 1 kilogram of fentanyl, and scheduled the delivery of the fentanyl on Tuesday, April 22, 2025 for $17,000.00.  Investigators intend to arrest FRANKLIN at this meeting on Tuesday, April 22, 2025.

### IV. STATEMENT OF PROBABLE CAUSE

11.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Background**

12.  In 2016, the FBI, Cleveland Field Office, Lima Resident Agency (RA), initiated an investigation into ongoing violent gang activity in the Lima, Ohio area. The investigation centered on the East Side Posse, a violent criminal organization with ties to the Chicago-based East Siders. The gang was known or suspected to be involved in numerous violent crimes including murder and armed robbery and was a significant contributor to the distribution of heroin and fentanyl-laced heroin in the Lima area—leading to an increase in overdose deaths.

13.  Agents uncovered a narcotics trafficking conspiracy moving controlled substances from Moreno Valley, California into the Lima, Ohio area.  During the investigation, FBI Special

---

[1] Laboratory results for the cocaine are pending.

Agent A.J. Elierman identified FRANKLIN as the primary narcotics source of supply based in Moreno Valley, California. This information was forwarded to me and I opened an investigation into FRANLKIN.

### B.  Los Angeles Field Office Investigates FRANKLIN

14. I conducted a search of law enforcement and commercial databases. Database checks showed FRANKLIN was on felony probation for a 2024 conviction for being a felon in possession of a firearm. FRANKLIN had prior convictions and arrests, including a conviction from 2017 for possession of narcotics for sales. FRANKLIN's probation address was listed on Harvard Way, Riverside, California. I also reviewed San Diego Police reports which detailed FRANKLIN's most recent arrest, during which he was driving SUBJECT VEHICLE (white Dodge Challenger bearing California license plate end in 286).

15. On Wednesday, December 4, 2024, Special Agents and Task Force Officers of the Inland Empire Safe Streets Task Force (IESSTF) conducted surveillance at FRANKLIN's residence located on Harvard Way, Riverside, California. Officers observed the SUBJECT VEHICLE parked in the driveway.

### C.  CI Coordinates a Controlled Drug Purchase From FRANKLIN on February 11, 2025.

16. Between November 2024 and February 2025, a Confidential Informant[2] (CI) communicated with FRANKIN using a

---

[2] The CI has been an informant with the FBI since October 2024. The CI has given credible information in the past and has assisted in an investigation into a violent criminal street gang. The CI has two convictions for felony possession of a
*(footnote cont'd on next page)*

social media application called Snapchat[3], sending direct text messages to FRANKLIN's account "kali_cuban." The CI sent messages to FRANKLIN and asked FRANKLIN if FRANKLIN could supply the CI with one kilogram of cocaine.[4] FRANKLIN agreed to sell the cocaine to the CI for $14,500.00 on February 11th, 2025 at the Best Western Hotel and Suites located at 24840 Elder Avenue, Moreno Valley, California (Best Western Hotel). The CI informed FRANKLIN he would be traveling from Ohio to California to conduct the drug buy.

### D. CI Conducts a Controlled Purchase of One Kilogram Cocaine from FRANKLIN

17. On February 11, 2025, starting at approximately 8:00 a.m., members of the Inland Regional Narcotics Enforcement Team (IRNET) established surveillance at FRANKLIN's residence enter address in order to identify FRANKLIN's source of drug supply and monitor his movements prior to the drug buy. At approximately 3:00 p.m., members of the Inland Empire Safe

---

controlled substance for sales. The CI has purchase heroin and cocaine from FRANKLIN several times. The CI is currently working for charging consideration for pending state charges in Ohio.

[3] Snapchat is often used by narcotics traffickers to communicate because the application uses disappearing messages, sends a notification to users of any screen recording or photos, and stores data for a short time.

[4] The communication between FRANKLIN and the CI for the drug buy was done via Snapchat, using Franklin's account "kali_Cuban" using the display name "TK$." This communication occurred prior to and in real time on the day of the drug buy and was later reviewed and photographed by investigators. During one instance prior to the drug buy, investigators in Ohio photographed messages detailing coordination and price. Investigators also photographed messages between the CI and FRANKLIN on the date of the buy, February 11, 2025. Due to the disappearing messages feature in Snapchat, investigators were unable to photograph messages sent by the CI not in their presence.

6

Streets Task Force (IESSTF) established surveillance at the Best Western Hotel.

18. At approximately 2:30 p.m., the CI arrived at Ontario International Airport, rented a vehicle, and traveled to meet with investigators. At about 3:58 p.m., the CI was briefed at a neutral location, where investigators searched both the CI and the CI's vehicle, yielding negative results for weapons or contraband. The CI then traveled to the Best Western Hotel, followed by investigators who maintained constant visual contact with the CI for the duration of the drive.

19. At approximately 4:35 p.m., the CI arrived at the Best Western Hotel and paid for Room 101. Investigators subsequently searched the room, searched the CI for money and contraband, installed surveillance equipment, and confirmed it was secure. The CI was equipped with audio and video recording devices and provided with $14,500 in government funds to conduct the transaction.

20. At approximately 5:15 p.m., the CI began communicating with FRANKLIN via Snapchat, confirming the time and location for the drug buy. At 7:03 p.m., FRANKLIN messaged the CI asking which hotel room they were in and advised the drugs would be delivered within one to two hours. At 8:25 p.m., FRANKLIN was observed by Task Force Officers assigned to IRNET parking the SUBJECT VEHICLE at an address on Magellan Lane, Perris, California, where he remained for about 90 minutes. FRANKLIN later sent a message from the via Snapchat asking the CI to meet at the address on Magellan Lane, stating he was there with the

7

"amigos." The CI declined, stating they did not want to pick up the cocaine from the residence. Shortly thereafter, FRANKLIN agreed to deliver the narcotics to the hotel room.

21. At approximately 10:09 p.m., the SUBJECT VEHICLE arrived at the Best Western Hotel and parked two parking stalls away from an FBI surveillance vehicle occupied by me and Special Agents Beck, Harakas, and Ricker. I positively identified FRANKLIN as he exited the SUBJECT VEHICLE wearing a black sweater and beanie, with a dark colored weighted bag. At 10:11 p.m., FRANKLIN entered the hotel room and delivered one plastic-wrapped package, suspected to contain cocaine to the CI. In exchange, the CI provided FRANKLIN with $14,500 in cash in a grey bank bag. The CI and FRANKLIN also discussed FRANKLIN's ability to deliver fentanyl. FRANKLIN told the CI his "boy" could get FRANKLIN fentanyl to sell to the CI. FRANKLIN exited the room at 10:16 p.m., returned to the driver's seat of the SUBJECT VEHICLE, and was observed by investigators leaving the Best Western Hotel parking lot. FRANKLIN was followed by a white Volkswagen sedan with a California license plate ending in 216, which was previously observed by the FBI surveillance team circling the hotel parking lot in what appeared to be counter-surveillance.

22. Shortly thereafter, TFO Valenciano observed the SUBJECT VEHICLE and Volkswagen park side by side in a nearby Jack in the Box parking lot. The SUBJECT VEHICLE and Volkswagen drove away from the location shortly thereafter and were not followed.

23. After the SUBJECT VEHICLE and the Volkswagen departed the area, investigators entered the CI's hotel room and recovered the suspected cocaine at approximately 10:36 p.m. The suspected cocaine was in a Target grocery bag and consisted of a single plastic-wrapped brick consistent with kilogram-level cocaine packaging. The weight of the suspected narcotics in the plastic packaging was about 1127.5 grams. On Friday, April 18, 2025, the suspected cocaine was field tested by California National Guard Counter Drug Analyst Sean Reidy using a TruNarc Narcotics Analyzer[5]. The test was positive for cocaine.

24. I reviewed and photographed the Snapchat messages exchanged between the CI and FRANKLIN. Below is a transcript of the messages sent on February 11, 2025:

FRANKLIN: What's ya eta?

CI: Headed to rental car. Hit you when I'm on the road.

FRANKLIN: U n wanna do it today or tomorrow?

CI: Today, they gotta get back on the road. My people drivin it back Headed to the room

FRANKLIN: Ok

CI: You still got the vacuum sealer? I can go grab one if not

FRANKLIN: Umm yer

---

[5] A TruNarc device is a handheld narcotics analyzer manufactured by Thermo Fisher Scientific. The device uses Raman spectroscopy to identify substances through packaging without opening or disturbing evidence, which minimizes exposure to dangerous drugs.

9

CI: ? Never mind. I gotta get some motor oil to put in it when I seal it anyway so I can grab it all at the same time. I gotta make sure I get the right sized bags I'm here

FRANKLIN: Ok gimmie a lil time to handle some shit then I'll pull up on u

CI: OK

FRANKLIN: Where yo room at?

CI: That same hotel 101

FRANKLIN: I cant remember which 1 it was

CI: Best Western

FRANKLIN: OK Hitchu in a lil bit

CI: Ok How long you thinkin ? I wanna try to get to LAX so I don't have to spend the night

FRANKLIN: I'm thinkin within the next hr or 2… Is that too long?

CI: Yeah, I wont be able to catch that flight, but I'll find another one

FRANKLIN: Ok my fault

CI: 100 (*emoji*)

FRANKLIN: If u wanna cum get it, it will be quicker

CI: Send Me the route Nah bro ima wait on you, I'm kinda scared to drive with it at night, I'm already on bond. I wanna be able to give it straight to my people

FRANKLIN: If u can pull up with the bread I'll put it in my car and follow u back to room - *sent a location pin a location on Magellan Ln* - I know this aint the normal routine but I got a lot going on I could explain later I

10

trust u hopefully u trust me It's here tho - *sent another location pin for Magellan Lane*

CI: I'm putting it in my maps. Hold on

FRANKLIN: Fasho here with the amigos How long?

CI: GPS says it's 20 minutes away. I'm kinda scared to drive with the bread at night to. I can't afford no interaction with the police. I ain't supposed to be out of the state

FRANKLIN: Iu can hop straight on freeway or if u trust me I can cum grab it and bring it back, I wasn't able to grab my bread out my spot

CI: My people starting to complain thinkin they would be back on the road by now

FRANKLIN: Matter fact we can put money in my car u can follow me and I'll put the thang in my care and u can follow me back with it That way u aint dirty but u cans follow so u know ain't no funny shit I'll cum to u not then u can jus follow to and fro We can get it over with

CI: I ain't worried about that, hold on I'm arguing with these mfs, they acting like they're ready to pull off

FRANKLIN: Or u can ride with me 1ether 1 Or even smoother u can uber… whatever works best

CI: Man these mfs bout to leave, I did tell them they'd be back. Ima just have to come back cause I don't have no other way to get it back.

FRANKLIN: So it's no go?

CI: They trippin cause they got sports Thursday Friday Saturday and They gotta take they kids. Ima just come back when you go it on hand

FRANKLIN: *CI and FRANKLIN speak on voice calls* - Couldn't hear u Can't hear u

CI: They said if you come now they'll wait

FRANKLIN: On my way!

CI: Ok - *CI calls FRANKLIN*

FRANKLIN: *Sends a screen shot of his map and estimated time of arrival to the CI location* - 9 Minutes

CI: Cool I sent them to get the vacuum tryna keep them cool.

FRANKLIN: Ok I can stop speeding Room 101?

CI: Yeah

FRANKLIN: Here

CI: Ok come on

### E. CI Coordinates a Controlled Purchase of Fentanyl from FRANKLIN

25. On March 25, 2025, I instructed the CI to contact FRANKLIN and request pricing for one kilogram of fentanyl. The CI sent a message to FRANKLIN via Snapchat. FRANKLIN told the CI the price for one kilogram of fentanyl is $17,000. I instructed the CI to arrange a meeting with FRANKLIN. FRANKLIN told the CI he would have the fentanyl available on Tuesday, April 22, 2025. Investigators intend to arrest FRANKLIN at the meeting on April 22, 2025.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

26. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

        e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

        f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

        g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

       h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

15

after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain

16

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  2. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of

the warrant: (1) depress FRANKLIN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of FRANKLIN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

28. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

29. For all of the reasons described above, there is probable cause to believe that FRANKLIN has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) (Distribution of 500 Grams or More of Cocaine). There is also probable cause that evidence of the Subject Offenses, as described in Attachment B, will be found in a search of the SUBJECT VEHICLE and the person of FRANKLIN described in Attachments A-1 and A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __18th__ day of
April, 2025.

_____
UNITED STATES MAGISTRATE JUDGE